**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**CORPUS CHRISTI DIVISION**

| | | |
|---|---|---|
| **VELMA HADDEN and** | | |
| **JOE CATENAZZO,** | § | |
| **Plaintiffs** | § | |
| | § | |
| **vs.** | § | **CIVIL ACTION NO. C-04-447** |
| | § | |
| **TEXAS REHABILITATION** | § | |
| **COMMISSION, now renamed TEXAS** | § | |
| **DEPARTMENT OF ASSISTIVE AND** | § | |
| **REHABILITATIVE SERVICES and** | § | |
| **THE STATE OF TEXAS,** | § | |
| **Defendants** | § | |

## MEMORANDUM AND RECOMMENDATION

Plaintiffs Velma Hadden and Joe Catenazzo filed this lawsuit pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*., and also pursuant to 29 U.S.C. § 794, the Rehabilitation Act of 1973, section 504, on August 24, 2004, alleging that their employer, the Texas Rehabilitation Commission ("TRC")[1], discriminated against plaintiff Hadden on the basis of sex and her disability and retaliated against both plaintiffs when they complained about the discrimination (D.E. 1, 20).  Defendant TRC filed a motion for summary judgment on August 16, 2005 to which plaintiffs responded on September 8, 2005 (D.E. 24, 28).

## JURISDICTION

This court has jurisdiction pursuant to 28 U.S.C. § 1331 and 1343.

---

[1]TRC recently was renamed the Texas Department of Assistive and Rehabilitative Services.

## BACKGROUND

### A.  Velma Hadden

Hadden began working for TRC in 1980 as a stenographer in Abilene, Texas (Decl. of Vel Hadden, D.E. 28, p. 1)[2].  Over the course of the next 24 years, Hadden earned a Bachelor's degree in psychology and received several promotions, eventually being named a Counselor IV, the highest counselor position (Hadden Decl., D.E. 28 pp. 2, 9).  In 1991 Hadden transferred to Corpus Christi as a counselor handling a general and rural caseload (Hadden Decl., D.E. 28, pp. 3-4).  She handled large, difficult caseloads and was involved in outside support groups for clients.  She received a number of merit raises, based on performance over and above regular job duties (Hadden Decl., D.E. 28, pp. 4-6)  She consistently received positive job evaluations and was rated high on agency audits (Hadden Decl., D.E. 28, pp. 6-7, 10).  Plaintiff was named "Employee of the Year" in 2000 (Hadden Decl., D.E. 28, p. 10).

Jack Mathis became the TRC Area Manager on November 1, 2002 and Hadden was concerned about his management style because she had heard him described as a "dirty old man" and "viper" from his previous co-workers (Hadden Decl., D.E. 28, p. 12).  Mathis used a motorized wheel chair and every morning he would stop by Hadden's office to ask about coffee and often told her about problems with his son.  He also would say that he needed to find Anna Chapa so that she could "tuck him," referring to his wheelchair power cord that needed to be put in a pouch.  He would say that Chapa was the "best tucker" he ever had and that she "tucked him

---

[2]Plaintiffs attached a number of exhibits to their response to the motion for summary judgment, but the exhibit tags apparently were rendered illegible when they were scanned into the court's record.  The exhibits will be identified by name rather than number.

tighter" than anyone else (Hadden Decl., D.E. 28, p. 13; Chapa Decl., D.E. 28, p. 2; Catenazzo

Decl., D.E. 28, p. 5).

Mathis often asked Hadden questions about TRC policy and he asked her to go to lunch

with him many times.  Hadden would always wait to see if anyone else in the office would join

them for lunch because she did not want to go to lunch with him alone.  Mathis appeared to be

supportive of Hadden's work and complimented her on how she handled difficult cases and

assumed extra duties (Hadden Decl., D.E. 28, p. 13).  In February 2003 Mathis asked Hadden to

accompany Catenazzo to Alice one day per week to help him with the caseload of Theresa Perez,

who was absent from work because of an illness.  Mathis told Hadden that she and Catenazzo had

"created a science" when it came to handling substance abuse treatment facility referrals and

clients and he wanted them to do the same at the Recovery Campuses of Texas ("RCT") which

was located in Alice (Hadden Decl, D.E. 28, p. 13).

Hadden bought a home computer in January 2003 and in March 2003 Mathis started

sending personal e-mails to her new computer.  The e-mails were jokes of a sexual nature and he

would send them to plaintiff and some of the other employees at TRC.  Hadden did not complain

about the e-mails right away because she did not understand what Mathis's intent was and she

feared retaliation if she complained (Hadden Decl., D.E. 28, p. 14).  Mathis asked plaintiff if she

had received the e-mails and told her he expected her to respond with e-mails and would tell her

in a joking fashion that the quarterly assessments of employees were coming up.  Plaintiff

understood Hadden's comments to be veiled threats regarding her performance rating if she

complained about the e-mails or failed to send him any e-mails (Hadden Decl., D.E. 28, p. 15).

Mathis also discussed his marital problems with Hadden, telling her that he and his wife

had not had sex for years and that his wife wore "big granny panties."  He often used the phrase

"Bite me," when talking to plaintiff (Hadden Decl., D.E. 28, p. 15).  In June 2003, plaintiff told Mathis that she wanted "all this stuff" to stop.  Mathis turned his wheel chair around and left her office without speaking, and did not speak to her again for a day and a half (Hadden Decl., D.E. 28, p. 15).  On June 3, 2003 Mathis gave Hadden a letter of counseling regarding a piece of equipment ordered for one of her clients which had disappeared from the office.  It was the first counseling letter she had received in 23 years at TRC.  An investigation was conducted and Hadden was eliminated as a "suspect." (Hadden Decl., D.E. 28,  p. 16).

Mathis continued to send Hadden e-mails in July, but he stopped discussing his personal life with her.  The tone of Mathis's reviews of Hadden's cases became more harsh.  In July 2003 while Catenazzo was in her office, Mathis told a joke about a parrot with a large penis.  Catenazzo left Hadden's office throwing up his hands and making a grunting sound.  Hadden told Mathis that she was serious about wanting the e-mails and all sexual stories to stop.  Mathis stared at her and then left her office without saying anything (Hadden Decl., D.E. 28, p. 17).

The employees in the local TRC region had been told that they could not approach anyone above Mathis or Nori Remondet, the management support specialist in the Corpus Christi field office.  After she complained to Mathis, Hadden thought he would take the appropriate steps and contact his supervisor to tell him that a complaint had been registered.  Hadden understood that she was not allowed to e-mail anyone above Mathis in the chain of command (Hadden Decl., D.E. 28, pp. 17-18).  On July 30 Hadden stopped Mathis in the hall to ask him to sign a leave form because she was taking a trip to meet friends out of town.  He asked her "So what color is this one?" which Hadden took to mean he was implying that she was going out of town with a boyfriend and was inquiring about his race.  Hadden had been divorced from her African-American husband for about one month at that time.  She did not respond to the question (Hadden Decl., D.E. 28, p. 18).

4

On August 4, 2003 plaintiff fell and fractured her wrist and arm, which required surgery to repair.  Hadden tried to talk to Mathis on August 5 after the surgery, but pain medication made her unable to have a coherent conversation (Hadden Decl. D.E. 28, p. 18).  In mid-August, Hadden discussed returning to work with Mathis and Remondet.  Remondet suggested she use a dictaphone instead of typing but Hadden wanted to try a one-hand keyboard.  Hadden asked Remondet to order the dictaphone, but she said she could not do it until Hadden returned to work.  Hadden asked for a summary of her leave as of July 2003 and Remondet said she would mail it, but never did (Hadden Decl., D.E. 28, p. 19).

Hadden and Catenazzo had been planning to attend a work-related conference to be held in October 2003, but in August 2003 Mathis told the woman working on the conference  arrangements that neither plaintiff would attend the conference.  In August plaintiff received an e-mail from Mathis that was racially insulting (Hadden Decl., D.E. 28, p. 20).

Plaintiff returned to work on August 26, 2003 and told Mathis she had a medical appointment on August 28, 2003 (Hadden Decl., D.E. 28, pp. 20-21).  At the end of the day her hand was very swollen and she was running a fever (Hadden Decl., D.E. 28, pp. 21-22).  On August 28 a TRC counselor called Hadden and told her that Mathis and Remondet were saying she was "AWOL" even though she had told Mathis about her appointment.  Hadden called Mathis and reminded him about her appointment (Hadden Decl., D.E. 28, p. 22).

On Monday, August 31, plaintiff called Mathis and told him she still had fever and pain and could not return to work.  Remondet told her she was out of leave and Hadden asked to use sick pool leave.  She was given emergency sick leave for August 31.  Hadden talked to Mathis on September 1 and he told her that she had sick pool leave through October 8, 2003 (Hadden Decl.,

D.E. 28, p. 23).  While at home, Hadden continued to discuss her cases with Catenazzo and other counselors (Hadden Decl., D.E. 28, pp. 23-24).

Hadden's hand and arm became worse and on October 3 she had another surgery.  While she was in the hospital, her daughter called Mathis to tell him about the surgery and he screamed at her and accused Hadden of trying to avoid being questioned by an investigator and of avoiding Mathis's calls.  After the surgery but while she was still in the hospital, Hadden talked to an investigator named Mr. Rodriguez who said he was investigating Catenazzo's time and travel records (Hadden Decl., D.E. 28, pp. 24-26).

Hadden was discharged from the hospital on October 6, 2003 and received a letter on October 7, 2003 with a two-page form to be completed by her doctor and returned by October 8.  Hadden took the form to her doctor who suggested she return to work on October 13, 2003 with the restriction of being able to type with only one hand.  Hadden called Mathis at 4:00 p.m. on October 8, to make sure he had seen the form and he told her that he was going to place her on leave without pay for October 9 and 10 because she was out of sick pool leave days.  Hadden pointed out that she had used only half of the sick pool leave days to which she was entitled, but Mathis told her she was now under investigation and he would not grant her any more sick pool leave days (Hadden Decl., D.E. 28, pp. 27-29).  On Friday, October 10, 2002 Hadden received a letter telling her that she was being terminated for running out of leave, but could reapply for work when she was able to do so (Hadden Decl., D.E. 28, p. 29).

**B.  Joe Catenazzo**

Plaintiff Catenazzo began working at TRC as a vocational rehabilitation counselor in December 1987 and his duties included assisting disabled persons in whom there was a reasonable expectation of returning to gainful employment (Decl. of Joe Catenazzo, D.E. 28, p. 1).

6

Over the years, he received a number of promotions and merit raises, as well as positive appraisals by supervisors and letters of gratitude from clients (Catenazzo Decl, D.E. 28, pp. 2-5). He was nominated Employee of the Year by 10 co-workers (Catenazzo Decl., D.E. 28, p. 4).

When Mathis was chosen as the Area Manager, Catenazzo was surprised. Morale in the office declined because Mathis' demeanor was unprofessional in that he used the expression "Bite me" to female employees and made inappropriate sexual and racial jokes. Catenazzo received sexual jokes from Nori Remondet in March 2003, but he did not take offense because he considered her a friend and understood that it was the nature of her humor. Catenazzo noted that she also sent the jokes to Mathis and he asked her if it was appropriate to do so. Remondet responded that it was all right for her them to exchange e-mails because they were sending and receiving the e-mails on their home computers (Catenazzo Decl., D.E. 28, p. 5).

One day Remondet brought something that looked like a vibrating peanut into the office and Catenazzo did not know what it was until Remondet explained it was something "a woman might use in a private area." Catenazzo thought Remondet enjoyed making him blush (Catenazzo Decl., D.E. 28, pp. 5-6).

In December 2002 Mathis assigned Catenazzo to work the caseload of Theresa Perez, a counselor in Alice who had become ill and did not know when she would be able to return to work. In February 2003 Mathis assigned Hadden to assist Catenazzo. Catenazzo and Hadden traveled to Alice once a week and he went more often than that. The situation lasted until June 2003 when Perez returned to work and was allowed to travel. Catenazzo assisted with Perez's case load until August 2003 (Catenazzo Decl., D.E. 28, p. 6).

In the Spring of 2003 Catenazzo noticed that Hadden seemed concerned and subdued. When he asked her what was going on, she told him that Mathis was sending her obscene e-mails

7

and that he was discussing his personal problems with her, including those of a sexual nature. Catenazzo advised her to confront Mathis, but Hadden was intimidated and had heard stories of Mathis's hateful nature.  She did not want to risk not getting a raise because she was caring for her disabled daughter and two grandchildren (Catenazzo Decl., D.E. 28, pp. 6-7).  Hadden told Catenazzo that she had confronted Mathis on two occasions but he continued sending her e-mails. Catenazzo had seen Mathis go into Hadden's office in the mornings and he was present when Mathis told an obscene joke about a parrot with a large penis.

In July 2003 Catenazzo confronted Mathis about the harassment after he saw Hadden had been crying.  Catenazzo ordered Mathis to stop sending obscene e-mails to Hadden.  Mathis became angry and he told Catenazzo to mind his own business and asked if Catenazzo was trying to "get in her pants." (Catenazzo Decl., pp. 7-8).

Toward the end of July, Catenazzo became aware that Mathis was collecting for review a number of cases that Catenazzo had worked for Theresa Perez.  When Catenazzo confronted Mathis about it, Mathis said it looked like Catenazzo was "padding a vendor's pocket."  Catenazzo did not know what Mathis was talking about (Catenazzo Decl., p. 8).

In early September 2003 Catenazzo became aware that Mathis and Remondet were calling clients on whose cases Catenazzo had worked.  Mathis told him they were doing a special query to see who was receiving training (Catenazzo Decl., pp. 8-9).  On September 16, 2003 Catenazzo was called in to speak with Investigator Richard Rodriguez (Catenazzo Decl., p. 9).  In November 2003 Catenazzo was given notice of possible adverse action and was given four days to prepare a response.  Catenazzo did so, rebutting every accusation made against him.  Catenazzo was terminated on December 4, 2003 (Catenazzo Decl., pp. 19-20).

### C.  Causes of Action

Plaintiff Hadden asserts that she suffered hostile environment sexual harassment because she was subjected to unwelcome verbal conduct of a sexual nature.  She also alleges that TRC discriminated against her when it failed to accommodate her arm and hand injury and allow her to return to work.  Both plaintiffs allege they suffered retaliation when they complained to their supervisor about sexual harassment.

In its motion for summary judgment, TRC argues that Hadden's allegations cannot support a prima facie case of sexual harassment and Hadden and Catenazzo cannot establish a prima facie case of retaliation because they did not engage in an activity protected by Title VII, and that if they did establish a prima facie case, that they cannot rebut the legitimate, non-discriminatory reasons given for their terminations.  In addition, defendant argues that Hadden cannot establish a causal connection between her protected activity and her termination because the decision maker was unaware of the protected activity.  Finally, defendant argues that Hadden's disability claim is barred by the Eleventh Amendment.

## APPLICABLE LAW

### A.  Summary Judgment Standard

Summary judgment is proper if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  See FED.R.CIV.P. 56(c).  An issue is material if its resolution could affect the outcome of the action.  Daniels v. City of Arlington, 246 F.3d 500, 502 (5th Cir.), cert. denied, 122 S. Ct. 347 (2001).  The Court must examine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  Anderson v. Liberty Lobby, Inc., 477

U.S. 242, 251-52, 106 S. Ct. 2505, 2512, 91 L.Ed.2d 202 (1986).  In making this determination, the Court must consider the record as a whole by reviewing all pleadings, depositions, affidavits and admissions on file, drawing all justifiable inferences in favor of the party opposing the motions.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).  The Court will not weigh the evidence or evaluate the credibility of witnesses.  Caboni v. General Motors Corp., 278 F.3d 448, 451 (5th Cir. 2002).

The movant bears the initial burden of showing the absence of a genuine issue of material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).  If the movant demonstrates there is an absence of evidence to support the nonmovant's case, the nonmovant must come forward with specific facts showing that there is a genuine issue for trial.  See Matsushita, 475 U.S. at 587, 106 S. Ct. at 1356.  To sustain this burden, the nonmovant cannot rest on the mere allegations of the pleadings.  See Celotex, 477 U.S. at 324, 106 S. Ct. at 2553; Caboni, 278 F.3d at 451; FED.R.CIV.P. 56(e).  After the nonmovant has been given an opportunity to raise a genuine factual issue, if no reasonable juror could find for the nonmovant, summary judgment will be granted.  Caboni, 278 F.3d at 451.

## B.  Title VII

Under Title VII, it is unlawful for an employer to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, national origin or age.  42 U.S.C.A. § 2000e-2; 29 U.S.C.A. § 623.  The analysis of a Title VII case is well known:

> The plaintiff must establish a prima facie case that the defendant made an employment decision that was motivated by a protected factor.  Once established, the defendant bears the burden of producing evidence that its employment decision was based on a legitimate

> nondiscriminatory reason.  The burden then shifts back to the plaintiff to prove that the defendant's proffered reasons were a pretext for discrimination.  But, if the defendant has offered a legitimate nondiscriminatory reason for its action, the presumption of discrimination derived from the plaintiff's prima facie case 'simply drops out of the picture,' . . .and 'the ultimate question [is] discrimination *vel non*.'

Mayberry v. Vought Aircraft Co., 55 F.3d 1086, 1089-90 (5th Cir. 1995)(citing St. Mary's Honor Center v. Hicks, 509 U.S. 502, 506, 113 S.Ct. 2742, 2747, 125 L.Ed.2d 407 (1993); Texas Dept. of Community Affairs v. Burdine, 450 U.S. 246, 253-257, 101 S.Ct. 1089, 1094-95, 67 L.Ed.2d 207 (1981);  McDonnell Douglas Corporation v. Green, 411 U.S. 792, 803, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1971)).

The focus then shifts to the ultimate question of whether the defendant intentionally discriminated against the plaintiff.  Grimes v. Tx. Dept. of Mental Health, 102 F.3d 137, 140 (5th Cir. 1996)(citing Hicks, 509 U.S. 502, 510-511, 113 S.Ct. 2742, 2749, 124 L.Ed.2d 407 (1993)). Title VII plaintiffs must ordinarily prove their claims through circumstantial evidence and may do so by demonstrating that a defendant's articulated non-discriminatory reason was pretextual. Grimes, 102 F.3d at 141 (citations omitted).  A plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may, but does not necessarily, permit the trier of fact to conclude that the employer unlawfully discriminated. Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000).  "Whether judgment as a matter of law is appropriate in any particular case will depend on a number of factors.  Those include the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered on a motion for judgment as a matter of law."  Id., 530 U.S. at 148-149, 120 S.Ct. at 2109.

11

### 1. Hostile Environment Sexual Harassment

To state a claim for hostile environment sexual harassment, one must show (1) that she belongs to a protected group; (2) was subject to unwelcome sexual harassment; (3) the harassment was based upon sex; (4) the harassment affected a term, condition, or privilege of employment and (5) the employer knew or should have known of the harassment and failed to take prompt remedial action.  Woods v. Delta Beverage Group, Inc., 274 F.3d 295, 298 (5th Cir. 2001)(citing Shepherd v. Comptroller of Public Accounts of the State of Texas, 168 F.3d 871, 873 (5th Cir. 1999)).

The harassment must be sufficiently severe to alter the conditions of the complainant's employment and create an abusive working environment.  Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 67, 106 S.Ct. 2399, 2405, 91 L.Ed.2d 295 (1986); Walker v. Thompson, 214 F.3d 615, 625 (5th Cir. 2000).  In order to prevail on a claim of hostile environment sexual harassment, a complainant need not show that the conduct seriously affected her well-being or led her to suffer injury, but that the environment would reasonably be perceived and is perceived as hostile or abusive.  Harris v. Forklift Systems, Inc., 510 U.S. 17, 22, 114 S.Ct. 367, 371, 126 L.Ed.2d 295 (1993)(citing Meritor, 47 U.S. at 67, 106 S.Ct. at 2405).  In order to determine whether an environment is hostile or abusive, a court must look at the frequency of the conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.  Harris, 510 U.S. at 23, 14 S.Ct. at 371.  In the Fifth Circuit, discriminatory verbal intimidation, ridicule and nasty insults may be sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.  Walker, 214 F.3d at 626 (citing Wallace v. Texas Tech University, 80 F.3d 1042, 1049, n. 9 (5th Cir. 1996)).  However, the mere utterance of an epithet which

engenders offensive feelings in an employee does not sufficiently affect the conditions of employment to implicate Title VII.  Harris, 510 U.S. at 21, 114 S.Ct. at 370.

Defendant argues that plaintiff cannot make out a prima facie case of sexual harassment because her allegations do not describe conduct that is severe or pervasive enough to create a hostile work environment.  Defendant does not dispute that Mathis sent Hadden obscene e-mails or that he tried to discuss his personal life, including sexual problems, with her.  However, in regard to the e-mails, defendant presented evidence that Hadden was part of a group that sent this type of e-mail joke to each other and Hadden would talk about and share the jokes during work hours (Decl. of Nori Remondet, D.E. 24, Ex. D, pp. 3-4).  Hadden disputes that there was a joke group (Hadden Decl., p. 15, D.E. 28).  Also, it was reported that Hadden participated in a "Fun Party" where adult sex toys were sold and that she bought a vibrator and took it to the office where she demonstrated how it "danced" (Remondet Decl., D.E. 24, Ex. D, p. 4).  Hadden did not dispute this allegation.

Where courts have found that plaintiffs have made out a cause of action for hostile environment sexual harassment, the circumstances tend to be extreme.  For example, in Meritor, over a four-year period the plaintiff felt obligated to have sex with her supervisor out of fear of losing her job and the supervisor made repeated sexual demands on her, fondled her in front of other employees, followed her into the women's restroom, exposed himself to her and forcibly raped her on several occasions.

In Harris, over a 19-month period, the supervisor made comments to the plaintiff like "You're a woman, what do you know?"and "We need a man as the rental manager." He also called her "dumb ass woman."  In front of other employees, the manager suggested that he and plaintiff go to a motel to negotiate her raise and occasionally asked plaintiff and other female employees to get

coins out of his front pants pocket.  He threw objects on the ground and asked female employees to pick them up and made sexual innuendo about their clothes.  In front of other employees, the manager asked the plaintiff if she had promised a customer sex as part of a deal she had negotiated.

In Waltman v. International Paper Co., 875 F.2d 468, 477 (5th Cir. 1989), an employee broadcast obscenities directed at the plaintiff over the public address system and other employees made suggestive comments to the plaintiff.  Her supervisor urged her to have sex with a co-worker, pinched her buttocks with pliers and tried to put his hands in her back pockets.  He and other employees made comments like "I would like to get a piece of that," referring to plaintiff.  Plaintiff received pornographic material in her locker and sexually explicit pictures and graffiti were drawn throughout the workplace, some of which were directed to plaintiff.  In addition, the plaintiff was subjected to several threats of violence for reporting the incidents.

Applying the law to the facts alleged by plaintiff in this case and looking at the evidence in the light most favorable to her, it does not appear that she has made out a prima facie hostile environment sexual harassment claim.  Although she was aggravated and annoyed by Mathis's conduct, she has not described behavior that was physically threatening or humiliating, or that unreasonably interfered with her work performance.  Harris, 510 U.S. at 23, 14 S.Ct. at 371.  She has not alleged that Mathis ever talked about her in a sexual manner, touched her or threatened her.  When she asked him to stop discussing her personal life with her, he did.  And even though he continued to send her e-mails and they contained sexual references, most of them were juvenile in nature and not particularly shocking or scandalous by modern-day standards (See generally, D.E. 24, Ex. B).  Accordingly, plaintiff has failed to present evidence to support a prima facie case of hostile environment sexual harassment and summary judgment should be entered for defendant on this claim.

### 2. Retaliation

### (a) Prima Facie Case

Plaintiffs also claim that they were the terminated in retaliation for complaining about Mathis's treatment of Hadden.  A plaintiff must show three things to establish a prima facie case of retaliation: (1) that the employee engaged in an activity protected by Title VII; (2) that an adverse employment action followed; (3) that there was a causal connection between the activity and the adverse action.  Collins v. Baptist Memorial Geriatric Center, 937 F.2d 190, 193 (5th Cir. 1991)(citing Jones v. Flagship International, 793 F.2d 714, 724 (5th Cir. 1987)).

Defendant argues that plaintiffs did not engage in an activity protected by Title VII because all they did was tell Mathis to stop sending e-mails and talking about his personal life with Hadden and that such a complaint was not protected activity.  Under the statute, it is an unlawful employment practice for an employer to discriminate against an employee because he has opposed any practice made unlawful by Title VII or because he has made a charge, testified, assisted or participated in any manner in an investigation, proceeding or hearing under Title VII.  42 U.S.C.A. § 2000e-3(a).  An employee's opposition to perceived harassment is a protected activity even in the absence of a hostile environment or quid pro quo claim actionable under Title VII.  Collins, 937 F.2d at 193.  See also Reed v. A.W. Lawrence & Co., Inc., 95 F.3d 1170, 1179 (2nd Cir. 1996)(same); Trent v. Valley Elec. Ass'n Inc., 41 F.3d 524 (9th Cir. 1994)(same) and Meeks v. Computer Associates Intern., 15 F.3d 1013, 1021 (11th Cir. 1994)(same).  It is clear from plaintiff's pleadings and affidavit that she perceived the e-mails and conversations to be sexual harassment and that she and Catenazzo complained about the harassment to Mathis.   Accordingly,

when she and Catenazzo confronted Mathis and asked him to stop, they both were engaging in protected activity.

Defendant further argues that plaintiffs cannot establish a causal connection between their protected activity and the adverse employment action because the decision maker was unaware of the alleged protected activity.  TRC asserts that Terry Smith, the Regional Director, and Mathis's direct supervisor, made the decision to terminate the plaintiffs and that he was unaware of any complaints of sexual harassment made by either plaintiff (Decl. of Terry Smith, att. to D.E. 24). However, other evidence in the record shows that Mathis wrote the termination letters to Hadden and Catenazzo (October 3 letter to Hadden; December 4 letter to Catenazzo, D.E. 28) and Smith testified at his deposition that Mathis made the decision to terminate Hadden (Smith Depo., p. 27, D.E. 28).  Fact issues exist which preclude a determination that plaintiffs failed to make out a prima facie claim of retaliatory discrimination.

### (b) Legitimate, Non-Discriminatory Reason

Defendant argues that even if plaintiffs have made out a prima facie case, it has offered legitimate, non-discriminatory reasons for their terminations.

### (i) Hadden

In Hadden's case, the reason given for her termination was that she had exhausted all leave available to her and also that TRC lacked the staff and resources to hold open indefinitely the job of an employee who could not return to work (Smith Aff., p. 1, attached to D.E. 24).  Smith also said that an investigation by Richard Rodriguez had implicated plaintiff in violations of TRC policy with respect to her casework (Id.). Mathis said that Hadden was terminated because she exhausted 12 weeks of leave under the Family and Medical Leave Act and that he requested two

days of leave without pay for her, but Smith denied the request (Mathis Aff., D.E. 24, Ex. E, pp. 3-4).  Accordingly, defendant has presented a legitimate non-discriminatory reason for terminating Hadden.

To show evidence of pretext, Hadden points out that she asked for two days of leave without pay for Thursday and Friday, October 9 and 10 because she planned to return to work on October 13, 2003 (Hadden Decl., D.E. 24, p. 28; Return to Work form, pp. 1-2).  Smith acknowledged that he had the authority to grant her the two days of leave without pay, but decided not to because of the ongoing investigation which he believed was going to reveal major policy violations (Smith Depo., p. 17, D.E. 24).  Plaintiff points out the report was not even complete at the time she was terminated and in any case, she disputes its findings and conclusions (Hadden Decl., pp. 29-41).  Plaintiff also presented evidence that another TRC employee, Theresa Perez, was away from work for almost three months and then was allowed to return to work half time and with a restriction that she not travel in the field for an unspecified amount of time.  Catenazzo and Hadden were assigned to cover her caseload while she was out (Perez letter, D.E. 24).

Were a jury to believe Hadden's version of events, that she worked for TRC for 23 years with an exemplary record, was terminated for using up her leave when all she needed was two days of leave without pay, that at least one other employee was treated more favorably under similar circumstances, and that the termination came on the heels of her complaining about what she perceived to be sexual harassment, it might very well conclude that the termination was retaliatory in nature.  Accordingly, fact issues exist which preclude summary judgment on Hadden's retaliation claim.

### (ii) Catenazzo

Mathis stated in his affidavit that Catenazzo was terminated for misconduct and gross inefficiency relating to time/leave policy and procedures, case management procedure and travel policy.  In particular, Mathis said Catenazzo was found to have falsified consumer personal identification numbers ("PIN's"), case note documentation, time and leave records and travel reimbursement requests.  In addition, Mathis concluded that Catenazzo was instrumental in the payment for consumer services to vendor Wanda Sherman which were not provided.  Mathis relied on the November 3, 2003 report prepared by Richard Rodriguez (Mathis Decl., D.E. 28, Ex. E, p. 3).

The report sets out that Recovery Campuses of Texas ("RCT") is a licensed substance abuse treatment facility located in Alice, Texas.  TRC does not purchase any services from RCT; rather it is used only as a referral source.  Wanda Sherman is a Community Rehabilitation Program provider in Nueces County.  She provides personal social adjustment training, extended rehabilitation services, supported employment, job quest training, job placement, job coaching and vocational adjustment training (Report, D.E. 24, Ex. A-1, p. 1).  Sherman had worked as a Rehabilitation Services Technician ("RST") at TRC for five years prior to opening her own business (Report, D.E. 24, Ex. A-1, p. 2).

Sherman was accused of having taken applications and information from clients and of having given them PIN numbers, which was not her responsibility, but rather the responsibility of a VRC like Hadden or Catenazzo.  Also, Sherman was accused of providing training for some residents of RCT who already were employed, the implication being that she charged TRC for unnecessary services.  In addition, Sherman was accused of documenting that she had provided training for residents when she had not (Report, D.E. 24, Ex. A-1, p. 3).

18

Catenazzo was accused of requesting travel reimbursement for trips to Rockport on the same days that computer records showed that he had conducted face-to-face interviews with RCT clients in Alice.  Also, an RCT client had reported that Sherman gave him a PIN number and interviewed him, when those activities were Catenazzo's responsibility.  Catenazzo also was accused of providing services and tools to a client who already was trained as a barber (Report, D.E. 24, Ex. A-1, p. 5).  In addition, the investigator questioned why, in the case of one client for whom TRC bought tools, the purchase order did not show an estimate or bid sheet for the tools specified.  In another case, the investigator questioned why the purchase order was incomplete and there was no invoice total (Report, D.E. 24, Ex. A-1, p. 6).  RST Sherry Cruz reported that while Catenazzo was working Theresa Perez's case load, she found purchases that did not have the required documentation and that when she asked Catenazzo for it, he would tell her that he was going to provide it, but he never did (Report, D.E. 24, Ex. A-1, pp. 6-7).

The investigator interviewed three of Hadden's RCT clients, all of whom said that Sherman interviewed them and provided job search training and job interview training.  One of them said he met with Hadden, but she did not conduct an interview with him and did not return his telephone calls.  He also said that he obtained employment on his own and Sherman did not place him in a job (Report, D.E. 24, Ex. A-1, pp. 7-8).  Another client said he met with Sherman and "another heavy-set woman" and gave them his information.  He received training from Sherman, but obtained a job on his own.  He asked for help with purchasing tools, but Sherman did not respond (Report, D.E. 24, Ex. A-1, p. 8).  A third client said that ten days after he arrived at RCT, he began working for a construction company.  Subsequently, he attended a meeting with Sherman and Hadden and talked to Sherman about TRC services.  He told her he was working, but she took all of his personal information from him, to see if qualified for TRC services.  He attended training

19

sessions on job interviews and other employment related matters.  He later found a job with a

welding company.  Sherman did not place him in the job, but she did provide him with some work

boots he needed.  Catenazzo issued the purchase order for the boots and RST DeLane Young paid

it.  Sherman signed the receipt for Sears and the client signed his name under hers.  Mathis told the

investigator that the signature did not look like that of the client (Report, D.E. 24, Ex. A-1, p. 9).

Investigator Rodriguez also interviewed four of Catenazzo's clients.  Three of them

attended training provided by Sherman.  One of them said Sherman interviewed him and gave him

a PIN number and that Catenazzo did not interview him.  TRC provided him with barber tools, but

neither Sherman nor Catenazzo went with him to pick them up (Report, D.E. 24, Ex. A-1, pp. 10-

11).  Another client said he met with Catenazzo, but was not interviewed or given a PIN number.

TRC provided him with tools and he met Sherman at Home Depot to pick them up (Report, D.E.

24, Ex. A-1, p. 11).  A third client said Wanda told him she worked for TRC and gave him a PIN

number.  He received training from her, but she did not place him in a job (Report, D.E. 24, Ex. A-

1, p. 12).  A student said Sherman, Catenazzo and Hadden went to his high school and Sherman

took his personal information and gave him a test.  He did not receive  any training and no one

from TRC ever contacted him again (Report, D.E. 2, Ex. A-1, p. 12).

The investigator also noted that records showed that Catenazzo often logged on to his home

computer during weekday afternoons, and would do so on days he requested travel reimbursement

to Rockport or Alice (Report, D.E. 24, Ex. A-1,pp. 12-13).

Catenazzo and Hadden dispute the findings of the report.  Catenazzo argues that it is

obvious that Rodriguez was not familiar with the daily activities of a TRC counselor.  Rodriguez

testified that at the time he conducted the investigation he was a food stamp caseworker and that it

was his feeling that Catenazzo should have spent more time with the clients (Rodriguez Depo.,

D.E. 24, pp. 34-35, 38).  He also testified that the time spent with a particular client would vary with the client's needs and that there was no way to calculate how much time a counselor should spend with a client (Rodriguez Depo., D.E. 24, pp. 36-37).

Catenazzo explained that he traveled to Rockport on Thursdays and Alice on Wednesdays and on other days as needed.  He used a laptop computer, but not all of the rural offices had computer hookups, so he would take paper applications and later enter the information into his computer.  He often did the computer work at home, as did other rural counselors.  A record was made of his computer log-ins and it was known he was working at home.  At one point he was praised for the amount of computer time he logged out of the office and he often worked late and on weekends (Catenazzo Decl., D.E. 28, pp. 10-12, 14-15).

Catenazzo also pointed out that even though Sherman might not have found a particular job for an RST client, she had provided training to enable the client to find a job on his own.  Also, she provided tools, uniforms and equipment for jobs (Catenazzo Decl., D.E. 28, pp. 13-14).  Catenazzo explained that a four-digit PIN would be chosen by the client and used as the client's official signature when client information was entered into the computer (Catenazzo Decl., D.E. 28, p. 14).  Sherman had no need to provide PIN numbers to clients because there was no place for the clients to access a computer and Sherman did not have access, authority or the knowledge to utilize a TRC computer to enter profile information (Catenazzo Decl., D.E. 28, pp. 15-16).

Regarding the discrepancies in his computer log, Catenazzo explained that he normally would meet with a group of interested persons and explain TRC's mission and purpose.  Those who chose to apply would be asked basic information.  Later, they would be asked to provide more detailed profile information.  The date the basic information was entered was automatically shown on the computer and could not be changed, as was the date the profile information was

21

entered.   If there was no computer hookup at the location where the initial information was taken,

Catenazzo would enter the information when he returned home in the evening.   Then on the

following day, while he was at a different rural location, he might enter the profile data when he

had a break between clients.   That was why records might show that he had seen the client in

Rockport or Aransas Pass when he had in fact seen the client the previous day in Alice (Catenazzo

Decl., D.E. 28, pp. 16-17).

It was normal for a client to see a CRP like Sherman more often than he saw a counselor

like Catenazzo, because she interviewed clients to obtain information for a resume and also

provided training.   Many clients were confused about the different roles of the service providers

(Catenazzo Decl., D.E. 28, p. 17).   Regarding the provision of services to RCT clients who

already were employed, Catenazzo explained that RCT residents were required to obtain whatever

employment they could, so many of them went to work in day labor jobs such as picking up trash

that either were not in their vocational fields or did not utilize their skills.   According to TRC

policies, the residents were eligible for TRC services to help them find more long term

employment (Catenazzo Decl., D.E. 28, p. 19).

Catenazzo disputes all of the factual findings on which TRC relied to terminate his

employment.   In addition, he points out that his case load averaged 160 or more clients for the

three years prior to his termination and that during 2001 and 2002 he had 121 percent of his

required closures.   His cases routinely were reviewed by management and no problems were

noted.   Only after he confronted Mathis about the perceived harassment was he investigated and

terminated (Catenazzo Decl., D.E. 28, p. 20).

Fact issues exist regarding the reasons given by TRC for terminating Catenazzo because he

has presented evidence from which a jury could conclude that he did not violate TRC policy.

Moreover, because the investigation began very soon after Catenazzo asked Mathis to stop bothering Hadden, the jury could conclude that the investigation and its results were motivated by a retaliatory animus.  Accordingly, summary judgment should not be entered for defendant.

## C.  Rehabilitation Act

Defendant argues that plaintiff's claims under the Rehabilitation Act are barred by the Eleventh Amendment because the State of Texas did not knowingly waive its sovereign immunity by accepting federal funds, but the argument is foreclosed by Pace v. Bogalusa City School Board, 403 F.3d 272 (5th Cir. 2005).  There, after a lengthy analysis, the Court held that a state knowingly waives its immunity under the Eleventh Amendment when it accepts federal funding pursuant to section 504 of the Rehabilitation Act of 1973.  The Court reiterated its holding in Miller v. Texas Tech University Health Sciences Center, 421 F.3d 342, 345 (5th Cir. 2005).  Defendant's argument to the contrary is without merit.  Because neither party addressed the merits of plaintiff Hadden's Rehabilitation Act claim, it is not subject to summary judgment.

## RECOMMENDATION

Based on the foregoing, it is respectfully recommended that defendant's motion for summary judgment (D.E. 24) be granted in part and denied in part.  Summary judgment in favor of the defendant on plaintiff Hadden's claim for hostile environment sexual harassment should be entered.  Plaintiffs Hadden and Catenazzo should be allowed to proceed on their claims for

retaliatory discharge and Hadden should be allowed to proceed on her claim under the Rehabilitation Act.

Respectfully recommended this 16th day of November, 2005.

B. JANICE ELLINGTON
UNITED STATES MAGISTRATE JUDGE


### NOTICE TO PARTIES

The Clerk will file this Memorandum and Recommendation and transmit a copy to each party or counsel.  Within **TEN (10) DAYS** after being served with a copy of the Memorandum and Recommendation, a party may file with the Clerk and serve on the United States Magistrate Judge and all parties, written objections, pursuant to Fed. R. Civ. P. 72(b), 28 U.S.C. § 636(b)(1)(C) and Article IV, General Order No. 80-5, United States District Court for the Southern District of Texas.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within TEN (10) DAYS after being served with a copy shall bar that party, except upon grounds of *plain error,* from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court.  Douglass v. United Services Auto Ass'n, 79 F.3d 1415 (5th Cir. 1996) (en banc).